## SUPREME COURT.

GEORGE SHOEMAKER and another agt. EDWIN H. HASTINGS *et al.*

*Fraudulent conveyances — Transfers which are not void under* 2 *R. S. (Edm. ed.),* 135, *sec.* 1, *declaring void conveyances, &c., of personal estate, made in trust for the use of the grantor.*

The statute (2 *R. S.*, 135, *sec.* 1) has no application to real and actual alienation, upon valuable consideration and positive and real purposes, although incidental benefits are reserved to the grantor.

Its object is to render simply ineffectual, clearly nominal transfers of personal estate, when the entire use and control are, by declaration of trust, in or out of this instrument, left in him who makes the transfer. The statute only avoids conveyances which are wholly to the use of the grantor.

The contract in question was made in September, 1871. The father was a man of intemperate habits, having a wife and four children. The plaintiffs were two of those children. The other two were a son, aged fourteen and a daughter aged eleven. The plaintiffs negotiated with the father for a purchase of the farm owned by him, which consisted of the "Kilbury lot," of which he held the title in fee, subject to a mortgage of about $1,250, and another parcel known as the "Dorsey lot," which he held under a contract of purchase, on which there was due

·Shoemaker agt. Hastings *et al.*

some $850. The real estate was worth as follows: The Kilbury lot, $2,750; the Dorsey lot, $1,160. He was also indebted upon certain outstanding notes, given by him to various parties prior to the 1st of September, 1876. He also owned certain personal property, consisting of cattle, horses and farming utensils, some grain and cordwood. The value of the personal property was fixed at $1,300, for which they were to give their father a mortgage, payable in ten years, with annual interest. But before the agreement was made the plaintiffs and their father agreed to maintain the two younger children until they should arrive at the age of twenty-one years, and then to pay each of them $150, and that the mortgage to the father should be made for $1,000 instead of $1,300. Finally the articles of agreement were entered into September 20, 1876. The father agreeing to convey to the plaintiffs the "Kilbury lot" by a quit-claim deed, and to assign the "Dorsey lot"; and the plaintiffs on their part agreeing to pay all the promissory notes of their father given before September 1, 1876, and to pay the mortgage on the "Kilbury lot," and the amount upaid on the contract for the "Dorsey lot," and also to support and maintain the younger children until they should respectively arrive at the age of twenty one years, and then to pay each of them $150, and to give their father a mortgage for $1,000, as specified. Soon after the conveyances were executed and delivered as agreed:

*Held,* that the transfer was intended to be an actual alienation of the property described in it, and was not a conveyance in trust for the use of the grantor alone, and therefore did not fall within the condemnation of section 1 of 2 Edm. Stat. 135.

*Held,* further, that considering the amount of the property left in the hands of the father by the mortgage from the plaintiffs to him, as compared with the small amount of those debts which were not assumed by the plaintiffs, together with the willingness manifested by the father to secure, by good indorsed notes, the payment of the plaintiff's debt, and all the other debts then owing by him, the evidence presented a question of fact as to whether the father intended by the transfer of his real and personal property to delay, hinder or defraud his creditors, which should have been submitted to the jury, as requested by plaintiff's counsel:

*Held,* also, that there is nothing in the transfer of the property to the plaintiffs which necessarily operated as a fraud on the creditors of their father.

*Fourth Department, General Term, April,* 1881.

THIS action was brought to recover for the wrongful conversion of a yoke of oxen and of 800 railroad ties, the prop-

Shoemaker agt. Hastings *et al.*

erty of the plaintiffs. The defendants, as judgment creditors of Daniel Shoemaker, Sr., the father of the plaintiffs, levied upon and sold this property as the property of Daniel Shoemaker, Sr. The answers of defendants, after a general denial of the allegations of the complaint, allege that the property sold was transferred to plaintiffs by their judgment debtor Daniel Shoemaker, Sr., in September, 1876, with intent to defraud his creditors, and no other issue was raised by the pleadings. The facts and circumstances relating to that transfer are as follows : Daniel Shoemaker, Sr., was a farmer who for several years had owned and occupied a farm about three miles from the village of Bath, Steuben county. His family consisted of his wife and four children, to wit, the plaintiffs, George Shoemaker, then aged twenty-two, Daniel Shoemaker, Jr., aged nineteen, another son, aged fourteen, and a daughter aged eleven. Although one of the plaintiffs was then under twenty-one years of age, he had been manumitted by the father, and plaintiffs had for several years done business for themselves in their own name, and then owned a tract of land adjoining their father's farm which the plaintiffs had purchased of judge Rumsey in 1874, and which was commonly called the Blakesly lot. The family since 1875 had lived in a house belonging to the plaintiffs, situate on the Blakesly lot, and for several years the care of the entire property had devolved upon plaintiffs by reason of the intemperate habits of their father. In the latter part of August, 1876, Daniel Shoemaker, Sr., sold the farm and all his personal property to plaintiffs. His financial condition at that time was as follows, to wit :

His farm consisted of the Kilbury lot, containing
   110 acres, worth $25 per acre............... $2, 750  00
And the Dorsey lot, 58 acres, worth $20 per acre .   1, 160  00

   Total value of real estate.................. $3, 910  00
He also owned personal property worth..........   1, 300  00

   His real and personal together amounted to.. $5 210  00.

Brought forward......................... $5, 210 00

### *Contra.*

There was a purchase-money mortgage
on the Kilbury lot which, with in-
terest, amounted to............... $1, 250 00
There was unpaid on his contract for
the Dorsey lot, with interest........ 850 00
His outstanding notes were estimated at 1, 500 00

And he owed the following debts
not in notes, viz. :
Mrs. Hodge.............. $110 00
Defendant James Neel...... 20 00
Defendants Hastings & Coy. 70 00
————— 200 00
————— 3, 800 00

He was therefore worth above his debts about... $1, 410 00

For the real estate the plaintiffs agreed to pay... $3, 600 00

As follows, viz. :
By assuming the mortgage on the Kilbury lot
interest ...................................... $1, 250 00
By assuming to pay up the Dorsey contract..... 850 00
By assuming to pay all the notes of Daniel Shoe-
maker then outstanding...  ............... 1, 500 00

$3, 600 00

The plaintiffs also taking the land subject to the inchoate
dower of their mother, and also agreeing to support their
young brother and sister until their majority. This price
paid by the plaintiffs for the land was concededly all that it
was worth, and was $900 more than it had cost Daniel Shoe-
maker, Sr., a short time before. By this sale, therefore, of
his real estate alone, Daniel Shoemaker, Sr., provided for all
his debts with the trifling exception of the accounts to Mrs.

Shoemaker agt. Hastings *et al.*

Hodge and defendants, together amounting to about $200, the exact amount of which was not then known. The plaintiffs and their father were unable to agree upon a price for the personal property, the father claiming $1,500 for it, but he finally agreed to refer the question of value to his neighbor David B. Brooks, and the latter fixed the value of the property at $1,300, which amount plaintiffs agreed to pay, and to secure by a mortgage of the land. Daniel Shoemaker, Sr., then agreed with the plaintiffs that he would pay the $200 of accounts out of his mortgage. This bargain of sale was put into writing and signed and sealed by the parties September 20, 1876. While the writings were being drawn, Mr. Brooks, the neighbor who had fixed the value of the personal property, suggested to Daniel Shoemaker, Sr., that he ought to have the mortgage made for an even thousand dollars, and let plaintiffs pay the other $300 to the two younger children; to which the father agreed, and it was so provided in the contract. Daniel Shoemaker, Sr., then quit-claimed the land to plaintiffs, and assigned to them the Dorsey contract and the personal property, and they executed to him a mortgage of the farm, payable in ten years, with annual interest. The deed and mortgage were executed in September and October, 1876, but were left, with the contract, in the hands of the attorney, Mr. Oxx, so that the father might examine the mortgage before it was recorded, and both were recorded December 18, 1876. Neither Daniel Shoemaker, Sr., nor the plaintiffs waited for the final execution of the papers, but, immediately after the contract was signed, proceeded to carry out the bargain. The plaintiffs, as soon as the contract was signed, September 20, 1876, took possession and control of all the property, and as early as October 8, 1876, began to take up the $1,500 of notes, which they had assumed, by paying them or substituting their own notes for them. Daniel Shoemaker, Sr., also proceeded at once to arrange the $200 in accounts to be paid by him. In November, he gave his note to Mrs. Hodge,

indorsed by Judge McMaster, for the $110 claim, which was afterwards paid. On the ninth day of September, which was nine days after the bargain was made, but before the contract in writing was signed, he gave the defendants, Hastings & Coy, his note for their account, and at the same time offered to have it indorsed by Judge Rumsey or Judge McMaster, but they said they didn't want any indorser. This note to Hastings & Coy, was dated back at Hastings' request. At this, time, therefore, all of the debts of Daniel Shoemaker had been provided for, except these two claims of defendants, amounting then to about ninety dollars, and to pay this he had a good mortgage of $1,000, besides credit, which enabled him to procure, as indorsers of his paper, Judge Rumsey, William Rumsey, Judge McMaster, the Hon. H. H. Hull, John F. Little and J. F. Parkhurst. On the 13th day of December, 1876, Hastings & Coy sued, in justices' court, the note given them in September by Daniel Shoemaker, Sr., and on the 18th day of December, 1876, Daniel Shoemaker, Sr., assigned the $1,000 mortgage to McMaster & Parkhurst, to secure them for indorsing $110 note to Mrs. Hodge, and for their indorsements to raise money to pay the claims of Hastings & Coy and defendant, Neel. This assignment was to secure them on account of "any note or notes which they or either of them have or may sign as indorsers for D. Shoemaker, Sr." The only note McMaster & Parkhurst was then liable upon was the Hodge note of $110. Judge McMaster was indorser, after Judge Rumsey, on the Warden note of $300, but that note was one of the notes assumed by plaintiffs. The purpose of making this assignment of the mortgage was proven by the testimony of Daniel Shoemaker, Sr., where he testifies, "the purpose of making the assignment of that mortgage to McMaster & Parkhurst, was so that they would indorse paper with me to pay the balance of these debts that were not assumed by the boys." And that purpose was evident from the terms of the assignment itself. The theory of the defendants was, that Daniel Shoemaker, Sr., had made this sale of

$5,210 worth of property to escape the payment of these two accounts, amounting to about ninety dollars, although it was conceded that, after the sale, he offered to secure the claim of Hastings & Coy, and it is undisputed that he has remained every day since then entirely solvent, being worth $1,000 above his debts, and that he still remains so. Meanwhile the plaintiffs had got out some ties, part of them from the land purchased of their father, and the balance from the Blakesly lot, they had purchased from judge Rumsey. These ties were cut in November, December and January following the sale of the land. Hastings & Coy having perfected their judgment in justices court against Daniel Shoemaker, Sr., instead of attempting to collect this judgment from him, levied upon these ties and a yoke of oxen, being one of the yokes transferred by the contract with their father, and this levy was the first notice that plaintiffs had that these claims of defendants had not been paid. The plaintiffs immediately made arrangements for paying these claims, and went with their father to Hastings & Coy, and the father then offered again to give Hastings & Coy a note for the amount of their judgment and costs, indorsed by McMaster & Parkhurst, to whom he had assigned the real estate mortgage as security for that purpose. Hastings & Coy then refused to accept the note unless the plaintiffs would execute a release to them of damages occasioned from levying upon the ties. The plaintiffs then informed Hastings & Coy that the ties levied upon were not far from the river, and that the levy had prevented them from being taken by the railroad company when the inspector was around in February; that the snow might go off and high water take away the ties before the tie inspector came around again, and that if the ties were inspected and received by the company and not taken off by the flood, they would make no claim for damages by reason of the levy. Hastings & Coy refused then to make the settlement, and notified plaintiffs that they should sell the property. Accordingly the property, worth about $400, was sold under the execution and

bid in by the defendants for about eighty dollars, and soon afterwards this action was brought for the value thereof. All the facts above stated were proven and undisputed upon the trial. It was undisputed that plaintiffs paid the full value for all of the property; that provision was made at the time of the purchase for payment of all of the debts of D. Shoemaker, Sr.; that after payment of all the debts, there remained a surplus of $1,000 for D. Shoemaker, Sr., which he still owns; that plaintiffs went into immediate possession and control of the property, and all of the debts were at once paid, except the claims of defendants, which, at the time of the sale, D. Shoemaker, Sr., said he would pay, and which he has twice, since that time, offered to secure; and that defendants claims were, at all times, collectible from the property of their judgment debtor, D. Shoemaker, Sr. There was not a *scintilla* of proof of any fraud. At the close of the testimony, Mr. Rumsey, defendant's counsel, asked the court to direct a verdict for defendants as to all the property, except the ties taken from the Blakesly lot, upon the ground that the necessary result of the transfer to plaintiffs was to hinder and defraud defendants as creditors of D. Shoemaker, Sr. This motion was denied by the court. After decision of this motion, the same motion was made upon another ground, and was granted, and it is the decision of the court upon that motion that is now brought up for review. This motion was that the court direct a verdict for the defendants as to all the property except the Blakesly ties, upon the ground that the sale was void under the section of the statute which reads as follows: "All deeds of gift, all conveyances and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the creditors, existing or subsequent, of such person." The court held that the sale was void under this section, and that the property was liable not only for the past, but for the future debts of D. Shoemaker, Sr.; and the only question

submitted to the jury was the value of the Blakesly ties. The testimony upon which this decision was based is the testimony of the witness Oxx, to which we ask the particular attention of the court. To this decision plaintiff's counsel excepted, and among other requests, asked the court to submit to the jury the question whether the transfer of the land was fraudulent, and whether the transfer of the oxen was fraudulent. The motion was denied and plaintiffs' counsel expected. The jury rendered a verdict for plaintiffs, for the value of the Blakesly ties, and plaintiffs' exceptions were ordered heard in the first instance at the general term.

*J. F. Parkhurst*, for plaintiffs, appellants. I. The decision by judge RUMSEY, granting defendants motion, was erroneous for four distinct reasons: 1. The statute referred to does not apply to sales, but only to transfers in trust, without consideration, exclusively for the benefit of the assignor. 2. The statutes applies only to transfers of personal property, and could not affect the sale of the land from which the ties were afterwards taken. 3. The testimony of Oxx was insufficient to prove a trust, even if the statute was applicable. 4. The defense that the transfer was void under the statute of personal uses, was not available because not pleaded. To establish the proposition that the statute of personal uses does not apply to such a transfer as this, it is only necessary to call the attention of the court to the case of *Curtis* agt. *Leavitt* (15 *N. Y.*, 114–124, *and pages* 143–150; *page* 176 *and pages* 204, 205 *and* 206 ; *see, also, Rome Exchange Bank* agt. *Eames*, 1 *Keyes*, 600 ; *Bishop on Insolvent Debtors*, 181). 2. The statute applies only to transfers of personal property, and could not affect the sale of the land from which the ties were taken. A part of the ties sold by the constable were taken from the Kilbury lot, which was part of the lands sold to plaintiffs by their father. These ties were not cut until November, December and January following the sale of the land, and at the time of the sale and conveyance to plaintiffs

were growing timber, a part of the realty. Plaintiffs' counsel asked to go to the jury upon the question whether the sale of the land was fraudulent which was denied, and plaintiffs' counsel duly excepted. If, for the sake of the argument, we should concede that the transfer of the oxen was void under the statute of personal uses the transfer of the lands would nevertheless be valid and effectual. That would be true even if transferred by the same instrument. As stated in *Curtis* agt. *Leavitt*, this statute "has no reference to intentions, whether fraudulent or honest. The simple inquiry is whether the property belongs to the debtor not upon the theory of fraud but upon the theory of equitable title reserved to himself" (15 *N. Y.*, 122). It is for this reason that a transfer may be valid as to some property although made by the same instrument by which a void transfer of other property is made. Upon this point the case of *Curtis* agt. *Leavitt* (*supra*) expressly overruled the case of *Goodrich* agt. *Downs* (6 *Hill*, 438), and held that even if the transfer was void as to a part it would not be void as to other property transferred in the same instrument (*Curtis* agt. *Leavitt*, 15 *N. Y.*, 114; *Bishop on insolvent debtors*, 181; *Knox* agt. *Jones*, 47 *N. Y.*, 389.) As, therefore, the statute is by express terms limited in its application to transfers of *personal* property, it did not affect the transfer of the real estate. Plaintiff's title to the ties subsequently cut from this land, was, therefore, unaffected by this statute, unless a further "construction" of this statute is devised, giving it a *post facto* effect upon those unsuspecting hemlocks. 3. The testimony of Oxx was insufficient to prove a trust even if the statute was applicable. 4. The defense that a transfer was void under the statute of personal uses was not available because not pleaded. As this defense has nothing to do with the question of fraud, or the honest or dishonest intent of the parties (*Curtis* agt. *Leavitt*, 15 *N. Y.*, 122), it will hardly be claimed that it was provable under the second defense. It was equally inadmissible under the general denial. It was new matter, and it is a well-settled rule that the answer must

Shoemaker agt. Hastings *et al.*

contain and allege all those facts which, when the cause of plaintiff, if admitted or proved, the defendant must prove in order to defeat a recovery (*Code of Civil Procedure, sec.* 500; *McKyring* agt. *Bull*, 16 *N. Y.*, 297, 304; *Ayrault* agt. *Chamberlain*, 33 *Barb.*, 229, *approved* 31 *N. Y.*, 614). And defendant cannot give proof of any such defense if not pleaded (*Defendorf* agt. *Gage*, 7 *Barb.*, 18; *Kelsey* agt. *Western*, 2 *N. Y.*, 501; *Field* agt. *Mayer*, 6 *N. Y.*, 179; *Sanford* agt. *Travis*, 40 *N. Y.*, 140). The testimony of Oxx could not have been excluded upon plaintiff's objection, because it was proper and admissible under the second defense upon the question of fraudulent intent. The defendants, however, cannot avail themselves of this testimony to establish a defense not set up in the answer (*Brazil* agt. *Isham*, 2 *Kernan*, 9; *Field* agt. *Mayer*, 2 *Selden*, 179; *Page* agt. *Willett*, 38 *N. Y.*, 31; *Wright* agt *Delafield*, 25 *N. Y.*, 266; *Allen* agt. *Mercantile Ins. Co.*, 46 *Barb.*, 656; *Baldwin* agt. *U. S. Tel. Co.*, 1 *Lansing*, 135).

III. The motion made upon the ground that the transfer was made to defraud creditors was properly denied. There can be no fraud if the grantor retains enough property to pay all his other debts (*Jackson* agt. *Peck*, 4 *Wend.*, 300; *Babcock* agt. *Eckler*, 24 *N. Y.*, 623; 6 *Paige*, 62; *Van Wick* agt. *Seward*, 18 *Wend.*, 375). Even when affection is the sole consideration it is only *prima facie* fraudulent as to creditors (*Seward* agt. *Jackson*, 8 *Cowen*, 406; *Thompson* agt. *Hammond*, 1 *Edward Ch.*, 497; *Pell* agt. *Treadwell*, 5 *Wend.*, 661; *Proceas* agt. *McIntyre*, 5 *Barb.*, 424; *Billsboro* agt. *Titus*, 15 *How.* 95). And a liability as guarantor if proven would not have been considered without proof that the property was insufficient security for the balance of the purchase money (*Van Wyck* agt. *Seward*, 5 *Paige*, 62). And even if both plaintiffs had been infants the question of fraud was one for the jury (*Mathews* agt. *Rice*, 31 *N. Y.*, 457; *see also* 45 *N. Y.*, 554; *N. Y. Weekly Digest* [*Jan.* 20, 1879], 524).

*M. Rumsey*, for defendants, respondents.

I. Any part of the agreement between Daniel Shoemaker, Sr., and the plaintiffs, which was made at time of making written instrument of transfer of property, but not included in written instrument, which is for benefit of grantor, is equally fatal to the instrument as if it had been made a part thereof (*Southard* agt. *Benner et al.*, 72 *N. Y.*, 424, 431, 432; *Russell* agt. *Winne*, 37 *N. Y.*, 595; *Ward* agt. *Lowry*, 17 *Wend.*, 492). *a.* And this may be proved by parol (*Southard* agt. *Benner*, 72 *N. Y.*, 432). It was proved without objection, therefore there could be no error.

II. The transfer of this property from Daniel Shoemaker, Sr., to plaintiff was void under 2 Edmund's Statutes, 135, section 1, which reads, "All deeds of gift, all conveyances and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors existing or subsequent of such person." *a.* When the consideration of the conveyance is the benefit or support of grantor, his wife or children, conveyance is void against his creditors (*McLean* agt. *Button*, 19 *Barb.*, 450; 1 *Amer. Ldg. Cases*, 69; *Goodrich* agt. *Douns*, 6 *Hill*, 438; *Mackie* agt. *Carnes*, *Hopk. Ch.*, 373). *b.* When part of consideration is support of grantor or his family, such agreement can never be upheld against his creditors (*Robinson* agt. *Stewart*, 10 *N. Y.*, 195, 196). *c.* And when it appears in instrument that part of consideration is for future benefit of grantor, it is void on its face (*Carney* agt. *Griffin*, 2 *Comst.*, 365). *d.* An assignment is void for actual fraud, if while assignor provides for only a part of his creditors he attempts in the instrument to reserve any portion of the fund to himself. Such an attempt has been regarded as establishing what is sometimes termed a fraud in law, but more accurately it affords a conclusive presumption of an active, fraudulent design on the part of assignor (*Collumb* agt. *Caldwell*, 16 *N. Y.*, 484).

III. The assignment of property between D. S. and his

Shoemaker agt. Hastings *et al.*

sons were void under 2 Edmund's Statutes, 137, sec. 1: "Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands or in goods, or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, decree or judgment suffered, with the like intent as against the persons so hindered, delayed or defrauded, shall be void." The undisputed evidence was that one of the grantees was nineteen years old. The grantees both knew that the assignment carried all their father's property. Part of the consideration of the transfer by the terms of the instrument was, that the grantees should support and maintain the two infant children of the grantor until their majority, and then pay them each $150, and execute a mortgage to the grantor for $1,000, payable in ten years from its date, with interest annually, which was immediately on the day of its execution assigned to McMaster & Parkhurst. The grantees knew of existence of respondents' debts; knew of the failing if not insolvent circumstances of the grantor, and that respondents' debts were unprovided for, and that the result of the assignment left assignor with no means to pay respondents' debts; that it was also a part of the agreement that the grantor himself and his wife should always, as long as they desired, have a home on the land conveyed. Under the above circumstances the conveyance was void, because "a conveyance by one indebted at the time, by which the grantor secures some benefit to himself at the expense of his creditors, or by which creditors are prevented from compelling an immediate appropriation of the debtor's property to the payment of his debts, is deemed fraudulent and void" (*Young* agt. *Heermans*, 66 *N. Y.*, 382; *Stearns* agt. *Gage*, 79 *N. Y.*, 102, 104; *Robinson* agt. *Stewart*, 10 *N. Y.*, 190–193, 195;

*Collumb* agt. *Caldwell*, 16 *N. Y.*, 484; *Barney* agt. *Griffin*, 2 *Comst.*, 365; *Todd* agt. *Monell*, 19 *Hun*, 363). In last case part of consideration was for support of grantor and wife, and it was held void. *b.* The fact that plaintiffs assumed to pay certain debts of Daniel Shoemaker, Sr., by the transfer, does not render the transfer valid or protect them from Daniel Shoemaker, Sr.'s creditors (*Union Nat. Bk. of Albany* agt. *Warner et al.*, 12 *Hun*, 306). *c.* Whether the intent be to delay or to defraud creditors, the sale is equally fraudulent (*Plank* agt. *Schermerhorn*, 3 *Barb. Ch.* 644; *Bokenburgh* agt. *Hubbell*, 15 *Barb.*, 563, *n.*; *Ogden* agt. *Peters*, 21 *N. Y.*, 23). *d.* The instrument, if void in part, was void in the whole (*Mittnacht* agt. *Kelly*, 5 *Abb. Pr.* [*N. S.*], 445; *Goodrich* agt. *Donn*, 6 *Hill*, 438; *Mackie* agt. *Cairns*, 5 *Cow.*, 547, 580; *Grover* agt. *Wakeman*, 11 *Wend.*, 187, 225). The case of *Hungerford* agt. *Cartwright* (13 *Hun*, 647). I am of opinion that the case was decided on some other ground than appears in report, or else the line of authorities herein cited, particularly the one cited below, must have been overlooked. (*McLean* agt. *Button* (19 *Barb.*, 450), is upon all fours with case at bar, and that was an agreement between father and son for conveyance and support, and was held within the statutes (2 *R. S.*, 135, *sec.* 1) and void (*See Todd* agt. *Monell*, 19 *Hun*, 362 *and* 363). But our case is distinguishable from *Hungerford* agt. *Cartwright*, because it was a part of agreement here that grantor and his wife should have a home on the premises conveyed. This creates a trust. *f.* No particular form of words is necessary to create a trust (*Martin* agt. *Funk*, 75 *N. Y.*, 141; *Donovan* agt. *Van De Mark*, 78 *N. Y.*, 248).

IV. The transfer being void under 2 Revised Statutes, 135, section 1, as creating a trust for benefit of Daniel Shoemaker, and that appearing upon face of instrument and upon admitted facts, the court was right in holding transfer void in such case. Under that statute there never was any question for the jury; there is no question of intent here (*Spies* agt. *Boyd*, 1 *E. D. Smith*, 448; *Goodrich* agt. *Downs*, 6 *Hill*, 438).

V. The question of whether transfer was void under 2 Revised Statutes, 137, section 1, was in this case a question for court to decide, and not for the jury. The facts alleged in point three being undisputed: 1st. Where the transfer on its face shows that it must necessarily have the effect of defrauding creditors of grantor, it is conclusive evidence of fraudulent intent and is void (*Kavanaugh* agt. *Beckwith*, 44 *Barb.*, 194; *Cunningham* agt. *Freeborn*, 1 *Edw. Ch.*, 256; *Nicholson* agt. *Leavitt*, 2 *Selden*, 510). 2d. The same rule prevails where extrinsic facts admitted by parties or established by evidence without dispute or explanation make the transfer necessarily fraudulent according to the law of the case (*Kavanaugh* agt. *Beckwith*, 44 *Barb.*, 195; *Cunningham* agt. *Freeborn*, 11 *Wend.*, 254, 255; *Webb* agt. *Daggett*, 2 *Barb.*, 9; *Edgell* agt. *Hart*, 5 *Seld.*, 219; *Seymour* agt. *Wilson*, 14 *N. Y.*, 569.) 3d. When facts appear on face of instrument, or undisputed by evidence of the agreement, which render the agreement void, it is conclusive evidence of fraud, in fact, and must be so held by the court as a matter of law (*Southard* agt. *Benner et al.*, 72 *N. Y.*, 431, 432; see, also, *Clark* agt. *Wise, where this position is recognized*).

TALCOTT, *P. J.* — This action was tried at the Steuben county circuit, and the exceptions sent to be heard here in the first instance after a verdict for the plaintiff. The action was brought to recover the value of one yoke of oxen and of certain railroad ties, which the defendants had caused to be levied upon and sold as the property of Daniel Shoemaker, Sr., the father of the two plaintiffs, by virtue of a judgment and execution against him.

The defendants claimed that a certain contract between said Daniel Shoemaker, Sr., for the conveyance to the plaintiffs of certain real estate and personal property consisting of cattle, horses, farming utensils, &c., by Daniel Shoemaker, Sr., to the plaintiffs, and of which the yoke of cattle sued for constituted a portion, was void as having been made with the intent to

hinder, delay and defraud the creditors of the said Daniel Shoemaker, Sr. The contract in question was made in September, 1876. It seems that the father was a man of intemperate habits, having a wife and four children. The plaintiffs were two of those children. The other two consisted of a son aged fourteen and a daughter of the age of eleven. The two plaintiffs had for some time carried on the principal business of the plaintiff's farm, and then owned, as tenents in common in their own right, a tract of land adjoining their father's farm, known as the " Blakesly lot." For some time the business of carrying on the farm owned by the father had, by reason of his intemperate habits, devolved on the plaintiffs, and they had been negotiating with him for a purchase of the farm owned by him, which consisted of a lot known as the " Kilbury lot," containing about 110 acres, of which he held the title in fee, subject to a mortgage of about $1,250, and another parcel known as the Dorsey lot, which he held under a contract of purchase, on which there was, with the accumulated interest due, some $850. The real estate appears to have been worth as follows : The " Kilbury lot," twenty-five dollars per acre, $2,750 ; the " Dorsey " lot, twenty dollars per acre, fifty-eight acres, $1,160. He was also indebted upon certain outstanding notes given by him to various parties prior to the 1st of September, 1876. He also owned certain personal property consiting of cattle, horses and farming utensils, some grain and cord wood. In negotiating with the boys, Daniel, senior, claimed that this personal property was worth $1,500. But the parties disagreed as to the value .of the personal property and they finally agreed to leave it to a neighbor, a Mr. Brooks, to appraise the value of the personal property, which he fixed at only $1,300, for which they were to give the father a mortgage payable in ten years, with annual interest. But before the agreement was made the plaintiffs and their father, at the suggestion of Mr. Brooks, agreed to maintain the two younger children until they should respectively arrive at the age of twenty-one years, and then to pay each of them $150,

and that the mortgage to the father should be made for $1,000 instead of $1,300. Finally the articles of agreement were entered into under the date of September 20, 1876, the father agreeing to convey to the plaintiffs the "Kilbury lot" by a quit-claim deed, and to assign the contract for the "Dorsey lot," and the plaintiffs on their part agreeing to pay all the promissory notes of their father given before September 1, 1876, and to pay the mortgage on the "Kilbury lot," and the amount unpaid on the contract for the "Dorsey lot," and also to support and maintain the two younger children until they should respectively arrive at the age of twenty-one years and then to pay each of them $150, and to give their father a mortgage for $1,000 as specified. Soon after the conveyances were executed and delivered as agreed. On the trial it appeared that the plaintiffs had caused to be cut and drawn to the neighboring railroad, for sale to the road after they should have been inspected by the inspector for the railroad, the railroad ties which the plaintiffs had sold on their execution. They had been cut and drawn from the various lots mentioned, and how many were cut upon each lot seemed to be uncertain.

The court held and ruled that the transfer was void under that section of the statute which is contained in the Revised Statutes as the first section of the statute of frauds, and which is in the following words, viz.:

"All deeds of gift, all conveyances and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the creditors existing or subsequent of such person." (2 *R. S.* [*2d ed.*], 70.)

The counsel for the plaintiffs requested the court to submit to the jury the question whether this transfer was fraudulent, and the question whether the transfer of the land was fraudulent. But the court declined to submit either question to the jury, but held that the transfer was fraudulent and void *per se* under the said section of the statute, and only left to the jury the question of the amount and value of such of the railroad

ties as had been cut from the " Blakesly lot." To such ruling the plaintiff's counsel excepted, and that is the question presented by the case. We think the learned justice at the circuit erred in his construction of the statute in question. 1. Because the statute, by its terms, only applies to personal property, and could not affect the transfer of the land, and this error was in confining the question submitted to the jury to an investigation of the number and value of the railroad ties which had been, by the plaintiffs, got from the " Blakesly lot; " and, secondly, the statute referred to does not apply to actual sales, whether fraudulent or not, but only to transfers, &c., without consideration, and in trust for the *exclusive benefit of the grantee*, and the transfer in this case did not purport to be of that character.

This section of the statute came under the examination of the court of appeals in the leading case of *Curtis et al.* agt. *Leavitt* (15 *N. Y.*, 9) ; and in that case judge COMSTOCK, after an exhaustive examination of the statute, holds the following language at page 122 of the case :

"All reasoning and authority, as we have seen, concur in the conclusion that it (the section in question) has no application to cases of real and actual alienation upon valuable consideration, and for active and real purposes, although incidental benefits are reserved to the grantor. There is one other possible interpretation of the statute, and that is the one to which the language points. It is the deed to the use of the grantor which is void, and not the deed to other uses and for other objects. Its true name should be a statute of personal uses ; the object is to simply render ineffectual purely nominal transfers of personal estate. Where the entire use and control are, by a declaration of trust, in or out of the instrument left in him who makes the transfer, its policy is not unlike that of the statute concerning passive uses or trusts in lands, which have had, along with this, a contemporaneous existence of some centuries. It is not in any proper sense a statute against frauds, although fraudulent practices may have

Shoemaker agt. Hastings *et al.*

led to its enactment, but it is founded on the self-evident principle that man's property should pay his debts, although he has vested a nominal title in another. For that purpose the statute declares the title to be in the debtor, and no transfer which is entirely nominal can stand in the way. It has no reference to intentions, whether fraudulent or honest. * * * The statute only avoids conveyances which are wholly to the use of the grantor." Judge Brown, who also delivered an opinion in the same case, after an examination of the statute, and a reference to the case of *Mackie* agt. *Cairns* (*Hopk.*, 373), and quoting a portion of the opinion of the chancellor delivered in that case says : "These observations exhibit the true rule of construction, and show that the trusts referred to in the section are those mere passive trusts, *exclusively for the use of the grantor*, and where the title of the trustee is purely nominal, and the grantor is to retain the control and enjoyment of the property, and not trusts which are incidental expressed or resulting to the use of the grantor."

It is stated in the series of propositions adopted by the court, at the close of the case of *Curtis* agt. *Leavitt* (*at page* 295, *proposition* 3) that the court is "of the opinion that the statute applies only to the conveyances, &c., primarily for the use of the grantor, and not to instruments for other and active purposes, where the reservations to the grantor are incidental and partial." We are of the opinion, therefore, that the learned justice at the circuit erred in holding that the statute in question applied to the case. The transfer was intended to be an actual alienation of the property described in it, and was not a conveyance in trust for the use of the grantor alone, and therefore did not fall within the condemnation of the section of the statute referred to. Aside from the ruling by which it was held that the assignment of the property was, on its face and *per se* void, and considering the amount of the property left in the hands of the father by the mortgage from the plaintiffs to him as compared with the small amount of those debts which were not assumed by the plaintiffs,

together with the willingness manifested by Daniel, senior, to secure by good, indorsed notes the payment of the plaintiff's debt, and all the other debts then owing by him, we think the evidence presented a question of fact, as whether Daniel Shoemaker, Sr., intended by the transfer of his real and personal property to delay, hinder or defraud his creditors, which should have been submitted to the jury, in accordance with the request of the plaintiff's counsel. We do not see anything in the transfer of the property to the plaintiffs which necessarily operated as a fraud on the creditors of their father. .

A new trial is ordered, costs to abide the event.